UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TINA E., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      Case No. 1:17-cv-00649 |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND GRANTING THE COMMISSIONER'S MOTION
FOR JUDGMENT ON THE PLEADINGS**
(Docs. 10 & 12)

Plaintiff Tina Erdley brings this action for Disability Insurance Benefits ("DIB")

under 42 U.S.C. § 405(g) of the Social Security Act ("SSA") to reverse the decision of

the Social Security Commissioner (the "Commissioner") that she is not disabled.[1] On

March 27, 2018, Plaintiff filed a motion for judgment on the pleadings seeking to reverse

the decision of the Commissioner. (Doc. 10.) On May 21, 2018, the Commissioner filed

a motion for judgment on the pleadings asking the court to affirm that decision. (Doc.

12.) Plaintiff filed a reply on June 11, 2018, at which point the court took the pending

motions under advisement.

Plaintiff identifies five errors in Administrative Law Judge ("ALJ") Melissa Lin

Jones's disability determination: (1) the ALJ failed to properly assess Plaintiff's

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a continuous period of not less than 12
months[.]" 42 U.S.C. §§ 423 (d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental
impairment or impairments" must be "of such severity" that the claimant is not only unable to do
any previous work but cannot, considering the claimant's age, education, and work experience,
engage in any other kind of substantial gainful work which exists in the national economy. 42
U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

credibility; (2) the ALJ erred in discounting the testimony of Plaintiff's husband; (3) the ALJ failed to properly develop the record; (4) the ALJ erred in finding that Plaintiff's impairments did not meet the requirements of Listing 12.04; and (5) the ALJ's finding at Step Five was not based on substantial evidence.

Plaintiff is represented by Lewis L. Schwartz, Esq. The Commissioner is represented by Special Assistant United States Attorneys Meghan Jane McEvoy, Prashant Tamaskar, and Dennis J. Canning.

## I.     Procedural Background.

On October 7, 2013, Plaintiff filed an application for DIB, alleging a disability onset date of February 5, 2013. Her application was denied on January 23, 2014. Plaintiff filed a timely written request for a hearing and on December 9, 2015, ALJ Jones presided over Plaintiff's hearing from Buffalo, New York. Plaintiff appeared with her attorney and testified, as did her husband, Thomas Erdley, and Vocational Expert ("VE") Ruth Baruch. On January 14, 2016, ALJ Jones issued a written decision finding Plaintiff not disabled. Thereafter, Plaintiff sought review of ALJ Jones's decision with the Social Security Administration's Office of Disability Adjudication and Review Appeals Council, which denied her request on May 16, 2017. ALJ Jones's determination thus stands as the Commissioner's final decision.

## II.    Factual Background.

Plaintiff was born on October 27, 1971. She graduated from high school and completed one year of college in 1990. Although she had special education services in grade school, she did not have them thereafter. She previously held jobs as an account clerk, a sewing machine operator, and a customer service representative. Plaintiff's Disability Reports indicate that she worked as a sewing machine operator from 1993 through 2007, at which point she stopped working when her employer downsized. From 2007 until 2009, she worked as a debt collector. An October 2013 Disability Report completed by Plaintiff's attorneys indicated that she stopped working on February 2,

2009 because of her "conditions" but did not identify the conditions affecting her at that time.[2]

## A. Medical History.

On February 5, 2013, Plaintiff reported to the emergency room complaining of headaches, tunnel vision, nausea, and vomiting for the past five days. She stated that on the previous day, she experienced diminished hearing and vision, felt dizzy and sweaty, and her legs felt heavy. CT and MRI scans revealed a 3.4-centimeter neoplasm[3] within the third ventricle resulting in obstructive hydrocephalus. On February 7, 2013, Michael K. Landi, M.D., performed a "[r]ight transcallosal craniotomy and resection of [the] third ventricular neoplasm[.]" (AR 358.)

On February 8, 2013, a CT scan showed a "[s]mall amount of pneumocephalus and ventricular air . . . present secondary to surgery." (AR 947.) A February 9, 2013 CT scan revealed a "small amount of intraventricular hemorrhage . . . in the trigone region of the right lateral ventricle appearing less in amount than the previous study." (AR 946.)

On February 10, 2013, Plaintiff complained of recurrent headaches, but her nausea, vomiting, and tunnel vision had improved. She could move her extremities and her speech, memory, and orientation were stable. A February 11, 2013 CT showed "[i]mproving postoperative changes with no new infarct or intracranial hemorrhage." (AR 941.) Plaintiff was discharged on February 13, 2013 in stable condition and was instructed not to lift over sixteen ounces, drive, or engage in strenuous activity.

On February 16, 2013, Plaintiff began to experience confusion, nausea, weakness, lethargy, and loss of appetite. On February 17, 2013, she was admitted to the emergency room with "severe hyponatremia"[4] due to a syndrome of inappropriate antidiuretic

---

[2] As the ALJ points out, Plaintiff's benign brain tumor was first diagnosed in February of 2013.

[3] A neoplasm is "abnormal tissue that grows by cellular proliferation more rapidly than normal and continues to grow after the stimuli that initiated the new growth cease." Stedman's Medical Dictionary 1288 (28th ed. 2006) (hereinafter "Stedman's").

[4] Hyponatremia is "[a]bnormally low concentrations of sodium ions in circulating blood." Stedman's at 934.

hormone secretion ("SIADH") after she reported limiting fluid intake for two days. (AR 324.) Once her sodium levels were stabilized, Plaintiff was discharged with a fluid restriction. A chest X-ray on February 19, 2013 showed under-expanded lungs with bibasilar infiltrates.

Plaintiff met with Kristin Matteson, D.O., on February 25, 2013 and reported that while she was having trouble sleeping and was getting dizzy at times, she was slowly feeling better. Dr. Matteson noted that Plaintiff appeared healthy, well-developed, alert, and oriented. She also found that Plaintiff's sodium levels were stabilizing. On the same day, Plaintiff reported to Physician Assistant ("PA") MG Warner that, although her head was still sore, she felt well and was not experiencing headaches, blurred vision, or nausea. She appeared happy, alert, cooperative, clear, coherent, and exhibited good eye contact. Her extremities and gait were normal, and she had full strength and intact neurological findings. PA Warner opined that Plaintiff would need regular follow-up, but if she did not exhibit any regrowth in two years, the surgery "[could] be considered a success." (AR 344.)

On February 27, 2013, Plaintiff was evaluated for bilateral rib pain. During this evaluation, she denied anxiety and depression, she was alert and oriented, there were no signs of acute distress, and neurological findings were normal.

During a follow-up appointment with Dr. Landi on March 1, 2013, Plaintiff reported feeling well with the exception of headaches that she experienced behind her eyes and across her forehead which increased moderately when she was not taking Lortab which helped her symptoms. She denied nausea, blurred or double vision, seizure activity, gait instability, or bowel or bladder changes. She reported no changes in her memory, gait, speech, or cognitive function. Dr. Landi noted that Plaintiff appeared alert, appropriate, oriented, and coherent and exhibited full extremity motor strength, symmetric muscle bulk and tone, and normal gait and station. Dr. Landi stated that due to an interval change in Plaintiff's third ventricle, a follow-up CT scan would be necessary to monitor Plaintiff's status. Dr. Landi opined that Plaintiff had "a total,

temporary disability[,]" and advised that she take ibuprofen as needed for headaches. (AR 384.)

In a Patient Health Questionnaire that Plaintiff completed on March 5, 2013, she denied depressive symptoms. On March 12, 2013, a CT scan showed: (1) resolving "[p]ostoperative changes from [a] frontal craniotomy with resection of a third ventricular mass[;]" (2) "subtle hypoattenuation and mild irregularity . . . along the frontal horn of the right lateral ventricle, though the appearance [was] improved compared to the prior examination [and] is most consistent with resolving postoperative change[;]" and (3) "[m]inimal encephalomalacia/gliosis[5] in the right frontal lobe at the craniotomy site." (AR 322.) PA Warner noted that the "CT scan looks pretty good" and that Plaintiff would be cleared to drive when ready. (AR 352.)

On March 14, 2013, Plaintiff met with Amy Lynn Wnek, M.D., for evaluation of a pituitary disorder. Plaintiff reported dull headaches that were less frequent since her surgery, normal vision, and noted that she felt better. She occasionally experienced dizziness and lightheadedness but described it as "very minimal." (AR 368.) She stated that her memory had declined since surgery. A physical exam revealed that Plaintiff was alert, oriented, and comfortable, with clear speech and no signs of distress. She had normal mood and affect and intact judgment, insight, and memory. Her head and face appeared normal, her extremities were unremarkable, and she had a normal gait and station. She also had intact motor strength and full bilateral range of motion in her upper and lower extremities. Dr. Wnek noted tremors and stated that Plaintiff's headache and visual symptoms resolved after surgery.

At a neurosurgical re-evaluation with Dr. Landi on March 15, 2013, Plaintiff reported that her headaches had improved and she used Motrin intermittently for them, rating her pain a two out of ten. She denied blurred vision, lightheadedness, nausea, change in extremity strength or gait, or speech changes. She reported some pressure and

---

[5] Encephalomalacia is "[a]bnormal softness of the cerebral parenchyma often due to ischemia or infarction." Stedman's at 635. Gliosis refers to an "[o]vergrowth of the astrocytes in an area of damage in the brain or spinal cord." *Id.* at 812.

soreness behind her nose, as well as intermittent popping in both ears. Dr. Landi noted that Plaintiff "continue[d] to have some word finding difficulty and los[t] her train of thought easily, but otherwise denie[d] any recent change in her memory." (AR 387.) He observed that Plaintiff was oriented, had a healthy appearance and a pleasant affect, was in no acute distress, and was alert and appropriate. Her face was symmetric, she had intact eye movements, full recall, fluent and coherent speech, intact finger-to-nose testing, and no pronator drift. She exhibited full extremity motor strength, physiologic reflexes, symmetric muscle bulk and tone, and normal gait and station. A March 12, 2013 CT scan showed "interval improvement in the size of the third ventricle without any acute intracranial hemorrhage or changes" and Dr. Landi described Plaintiff's condition as "stable[.]" (AR 387-88.) At a follow-up appointment with Dr. Matteson on March 20, 2013, Plaintiff stated that she had been doing well. Dr. Matteson noted that Plaintiff's ventricles were improved and stated that she did not need to see Dr. Landi for five months.

On April 15, 2013, Plaintiff met with Dr. Wnek and reported that she was doing better and that, although she was tired, her headaches had improved since her last visit and her vision was back to normal. She denied dizziness, lightheadedness, and anxiety; examination findings were unchanged.

On May 20, 2013, Plaintiff met with Dr. Matteson and expressed concern regarding her memory loss. Dr. Matteson observed that Plaintiff appeared healthy, alert, oriented, and her extremities were normal. Dr. Matteson suggested that Plaintiff speak with Dr. Landi about a referral to a neurologist.

Three days later, Plaintiff reported to Dr. Wnek that she had not had any headaches since her last visit but felt her memory was not back to baseline, although she acknowledged that Dr. Landi told her that memory deficits could last up to a year after surgery. She reported "bout[s] of feeling weird at different times during the day[,]" but denied dizziness or anxiety. (AR 767.) She was alert and oriented with a normal mood and affect, and physical findings were unchanged. At another appointment with Dr.

Wnek on July 1, 2013, Plaintiff's symptoms and Dr. Wnek's findings remained unchanged.

A July 12, 2013 brain MRI revealed "postoperative changes from resection of a third ventricular mass with no findings to suggest residual/recurrent disease" and "no hydrocephalus." (AR 958.) Keith Kaplan, M.D., further observed that there were "two somewhat linear appearing areas of hyperenhancement centrally within the inferior aspect of the pons that are similar compared to the prior examinations, possibly slightly improved." *Id.* Dr. Kaplan opined that the two areas of enhancement could be related to capillary telangiectasia or chronic ischemic change, but that neoplasm was "exceeding[ly] less likely." *Id.* He recommended continued follow-up.

Plaintiff met with Dr. Landi on July 17, 2013, complaining of mild and dull headaches between her eyes and along the back of her neck occurring on average every two to three days. She reported intermittent nausea in the morning hours and intermittent pressure behind her nose as well as long-term and short-term memory difficulties, episodic blurred vision, and long-term right hand and foot numbness. She noted aching and soreness along the posterior cervical region with localized swelling and deep itching in her right ear over the previous week. Dr. Landi found that Plaintiff was alert, appropriate, and in no acute distress, with fluent and coherent speech. Face and eye findings were normal and she demonstrated good strength in all extremities. Dr. Landi reviewed the July 12, 2013 MRI and noted no evidence of a recurrent or residual tumor and no evidence of hydrocephalus. He recommended a follow-up MRI and reevaluation in four months.

During an appointment with PA Warner on September 18, 2013, Plaintiff complained of dizziness, memory issues, depression, and random ear and head pain. She felt her vision worsened and said she got dizzy at times, but she denied migraine headaches, lightheadedness and weakness. Plaintiff's score on a Mini-Mental State Examination was "within normal limits." (AR 848.) In the attention category, PA Warner noted that Plaintiff was able to spell "WORLD" backwards. In the recall category, Plaintiff was able to recall three objects that had been previously named. PA

Warner encouraged Plaintiff to maintain a healthy diet and exercise and recommended she try games or cognitive programs to improve her cognitive skills.

On October 7, 2013, Plaintiff saw Toni Murphy, D.O., for an endocrine consultation in relation to a hormonal disorder that developed after her February 2013 surgery. Plaintiff reported fatigue, sleep disorder, weight gain, anxiety, depression, numbness and weakness in her right hand, nausea, and memory problems. Dr. Murphy noted that Plaintiff was a "good historian" and appeared healthy, well-developed, alert, and oriented. (AR 985.) Plaintiff had a normal mood, intact memory, and normal attention and concentration. Dr. Murphy diagnosed Plaintiff with hyperprolactinemia[6] and assessed that she had normal pituitary function following her surgery with the exception of the adrenal axis, which could not be evaluated while she was taking hydrocortisone.

Plaintiff met with Dr. Matteson on October 9, 2013 and reported that she saw Dr. Landi and had a clear MRI. She nonetheless reported that she was depressed and upset that she felt she could not remember anything. In response, Dr. Matteson advised her to make an appointment with a neurologist for neuropsychological testing. An examination yielded normal results.

A November 6, 2013 brain MRI revealed no changes from Plaintiff's July 12, 2013 MRI, and Dr. Kaplan recommended continued follow-up. On November 20, 2013, Plaintiff had an appointment with Dr. Landi at which she reported depression, anxiety, memory impairment, occasional headaches behind her eyes, morning nausea, blurred vision, dizziness, loss of balance, intermittent left ear pain, and a brief, sharp head pain that had occurred twice. She denied weakness in her extremities, changes in bowel and bladder habits, or electric shock sensations. Dr. Landi observed that Plaintiff appeared alert, appropriate, oriented, and in no acute distress with normal speech and intact repetition. Her rapid alternating movements were intact. She had good strength in all

---

[6] Hyperprolactinemia is defined as "[e]levated levels of prolactin in the blood[.]" Stedman's at 926.

extremities and normal gait and station. Dr. Landi noted that she "present[ed] with multiple complaints dominated by depression, anxiety, and memory impairment." (AR 972-73.) Dr. Landi recommended a psychiatry evaluation and prescribed Cymbalta.

On May 12, 2014, Plaintiff told Dr. Matteson that she had been having headaches over the previous month and a half, experienced dizziness at times, and stated that her equilibrium was "still off[.]" (AR 1014.) Dr. Matteson assessed that Plaintiff's condition was stable and an MRI taken on the same day revealed stable post-operative changes with no evidence of recurrent neoplasm or hydrocephalus. Eleven days later, Plaintiff had an appointment with Dr. Landi who noted that Plaintiff presented "with a constellation of symptoms dominated by headaches, ear pressure, left ear pain, occasional gait instability, and memory impairment[,]" (AR 970), although she denied focal weakness in her extremities or bowel or bladder changes. Dr. Landi assessed that Plaintiff was in no acute distress, alert, had intact finger-to-nose testing, normal gait and station, and fluent and coherent speech. She exhibited good strength and reflexes, as well as symmetrical muscle bulk and tone. Dr. Landi recommended a follow-up brain MRI in February 2015.

Plaintiff met with Dr. Murphy on August 8, 2014, reporting generalized bone aching, fatigue, weakness, weight gain, nausea, memory problems, numbness in her right hand, and temporal pain in her head. She stated she was experiencing anxiety, depression, and dull headaches that she rated as five out of ten in intensity. Dr. Murphy assessed that Plaintiff had a full range of motion bilaterally, normal and symmetric strength, intact memory, articulate and fluent speech, and was attentive and able to concentrate. Reflexes were normal with the exception of an "[i]ntentional tremor involving the hands." (AR 976.) Dr. Murphy prescribed levothyroxine. When Plaintiff met with Dr. Murphy again on September 30, 2014, she stated that she initially felt better after their previous appointment, but she reiterated her complaints of low energy, left earache, headaches, weakness, eye pressure, right hand numbness, temporal head pain, weight gain, nausea, anxiety, depression, and memory problems. Examination findings were unchanged.

On October 22, 2014, clinical psychologist Cherie Ruben, Ph.D., completed an initial assessment at which she observed: "[Plaintiff] presents with symptoms of Anxiety Disorder due to a Medical Condition (pituitary gland tumor removal). . . . Symptoms include memory deficits, panic attacks, general anxiety, and some depressed mood." (AR 1000.) Dr. Ruben assessed that Plaintiff was oriented, animated, and cooperative, with an anxious mood, somewhat pressured speech, average intelligence, and fair insight and judgment. She found that Plaintiff's thought processes could be construed as bizarre and that her memory was not intact. Dr. Ruben diagnosed Plaintiff with "[a]nxiety [d]isorder [d]ue to . . . brain tumor removal" as well as a personality disorder. (AR 1002.) She determined that medications could potentially be helpful, but further evaluation would be necessary to determine which medications to prescribe.

On October 28, 2014, Plaintiff met with Nicolas Saikali, M.D., for a neurological evaluation, complaining of headaches, neck pain, memory issues, anxiety, and depression. Dr. Saikali determined that Plaintiff's orientation to person, place, and time was normal; she had an appropriate fund of knowledge for events and past history; and her attention span and concentration were appropriate, although she was anxious throughout the interview. Somewhat inconsistently, he noted that Plaintiff was "[p]ositive for . . . memory issues" and diagnosed her with memory loss, but nevertheless indicated that her "[r]ecent and remote memory was intact." (AR 1023.) Plaintiff's coordination was within normal limits, her gait was steady and symmetric, and she had normal motor strength in upper and lower extremities bilaterally. He found that Plaintiff had a decreased range of motion in her neck and some trapezius muscle trigger points which were tender to light touch. Dr. Saikali diagnosed Plaintiff with headaches, myofascial pain, anxiety, memory loss, brain neoplasm, and sleep disturbance. He noted that her head and neck pain were likely related to myofascial pain syndrome and that "abnormalities in her thyroid levels and pituitary abnormalities [are] causing her a significant amount of anxiety that is worsening over time." (AR 1024.) He also noted that anxiety itself could cause memory problems. He recommended magnesium and melatonin to improve her sleep, heating pads, exercise, stretching, massage, and

following a regimented sleep schedule. He further recommended treatment by a psychologist or a psychiatrist for underlying mood disturbances and anxiety.

At a follow-up appointment with Dr. Murphy on December 5, 2014, Plaintiff's condition remained unchanged. An MRI taken on January 27, 2015 revealed stable post-operative changes of a frontal craniotomy, no evidence of recurrent disease, and no acute intracranial abnormalities.

During appointments with Dr. Ruben from January through April 2015, Plaintiff presented as depressed and anxious. She continued to allege problems with memory and getting lost. In a February 11, 2015 appointment with Dr. Landi, Plaintiff complained of memory problems, mild headaches, intermittent nausea, vomiting, occasional blurred vision, and anxiety. Dr. Landi found that Plaintiff was pleasant, alert, appropriate, and in no acute distress. She had fluent and coherent speech, intact repetition, a symmetrical face, normal finger-to-nose testing, normal eye movements, no focal motor weakness or drift, symmetrical bulk and tone, and normal gait and station.

In May of 2015, Plaintiff fractured her right clavicle after she "slipped on mud and fell directly onto a stump[.]" (AR 1068.) She underwent surgery on May 7, 2015 and received follow-up care through September 2015. During this period, Plaintiff attended a therapy session with Dr. Ruben at which she presented as depressed and anxious, stating that she believed that her balance problems may have contributed to her fall. In subsequent appointments with Dr. Ruben in June and July of 2015, Dr. Ruben noted that Plaintiff had a slightly improved mood. Plaintiff reported that writing things down was helping with her memory issues. However, in an August 2015 appointment, Plaintiff presented as "very anxious" and complained of family problems. (AR 1037.)

On August 17, 2015, Plaintiff had a routine follow-up appointment with Dr. Landi who noted that Plaintiff reported persistent symptoms including memory loss, intermittent nausea, occasional vomiting, generalized weakness, blurred vision, unsteady gait, and headaches. Plaintiff noted that her head pain did not occur every day and ibuprofen helped relieve her eye pressure. Dr. Landi assessed that Plaintiff had fluent and clear speech, intact repetition, normal finger-to-nose testing, normal gait and station,

and good strength throughout her upper and lower extremities. He opined that her eye pressure might be related to sinusitis and referred her to an ear, nose and throat doctor. He reported that there was no evidence of any abnormal enhancement or recurrent tumor in her previous MRI and suggested follow-up in one year.

At an October 5, 2015 therapy session with Dr. Ruben, Plaintiff was distraught due to family issues stemming from medical problems and anxiety. On November 11, 2015, Plaintiff returned to Dr. Ruben, who noted that while family issues persisted, Plaintiff presented as improved.

On December 8, 2015, Dr. Ruben completed a "Mental Impairment Questionnaire" in which she described Plaintiff's mental health symptoms and limitations. Dr. Ruben wrote that Plaintiff had a "fair to good" response to psychotherapy sessions, which had taken place on a monthly basis from October 23, 2014 through December 8, 2015. (AR 1075.) She further noted that Plaintiff experienced four or more episodes of decompensation within a twelve-month period, each of which lasted at least two weeks. She indicated that Plaintiff had marked limitations in completing activities of daily living and in maintaining social functioning, concentration, persistence, and pace. Dr. Ruben noted that Plaintiff exhibited signs and symptoms of pervasive loss of interest in almost all activities, appetite disturbance with weight change, decreased energy, feelings of guilt or worthlessness, difficulty thinking or concentrating, and sleep disturbance. She reported that Plaintiff's mood was anxious, her speech was pressured, her memory was impaired, and her thought processes could be confused. Plaintiff's Global Assessment of Functioning ("GAF") score was forty-five.[7] Dr. Ruben opined that

---

[7] GAF scores are of limited relevance to a SSA disability determination. *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-5 (2000) (stating a GAF score "does not have a direct correlation to the severity requirements in [the SSA's] mental disorders listings"); *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) ("[T]he Commissioner has declined to endorse the [GAF] score for use in the Social Security . . . disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings.") (internal quotation marks omitted).

Plaintiff's impairments would cause her to be absent from work more than four days per month.

**B.    State Consultants' Assessments.**

On November 27, 2013, state agency consultant Gregory Fabiano, Ph.D., performed a psychiatric examination of Plaintiff in Buffalo, New York. Plaintiff reported that she attended regular education classes throughout her schooling and that her last job ended five years ago when her employer eliminated her position. She denied psychiatric hospitalizations or treatment. She described having problematic sleep patterns, anxiety around others, poor memory, depressed mood, social withdrawal, and fatigue. She denied symptoms of generalized anxiety disorder, thought disorder, post-traumatic stress disorder, or mania. Plaintiff reported that she could dress, bathe, and groom herself, but did not cook, clean, do laundry, shop, manage money, drive, or take public transportation. She reported that her family relationships were "terrible at times" but that she enjoyed going out with friends and watching television. (AR 874.)

Throughout the interview, Plaintiff exhibited circumstantial thought processes, depressed affect, and dysthymic mood. Dr. Fabiano assessed that Plaintiff's "[m]anner of relating, social skills, and overall presentation was poor[,]" and she was tearful throughout the interview but cooperative. (AR 873.) She was able to complete a counting task and simple calculation, but when asked to complete a task designed to measure mental function, she said she was unable to do so. She could recall three out of three objects immediately, but struggled to recall those objects five minutes later. Plaintiff could remember four digits in a forward fashion and two digits in a backward fashion. Dr. Fabiano concluded that Plaintiff's attention, concentration, and recent and remote memory skills were impaired. He opined that Plaintiff's intellectual functioning was average and that she had fair insight and good judgment.

Dr. Fabiano diagnosed Plaintiff with "[a]djustment disorder with mixed anxiety and depressed mood, chronic" and "[c]ognitive disorder[.]" (AR 874-75.) He provided the following medical source statement:

> The claimant does not . . . appear to have any limitations in her ability to follow and understand simple directions and instructions, perform simple tasks independently, or make appropriate decisions. She appears to have some moderate limitations in her ability to maintain attention and concentration, relate adequately with others, and appropriately deal with stress. The claimant may have some moderate limitations in her ability to maintain a regular schedule, learn new tasks, and perform complex tasks independently due to cognitive impairments.
>
> The results of this examination appear to be consistent with psychiatric problems, and this may be significant enough to interfere with the claimant's ability to function on a daily basis.

(AR 874.) He recommended that Plaintiff initiate psychological and psychiatric treatment and enroll in a rehabilitation program to work towards regaining lost functioning.

That same day, Abrar Siddiqui, M.D., completed a neurologic examination at which Plaintiff reported short-term and long-term memory loss, confusion, dizziness, loss of balance, depression, forgetfulness, weakness, and intermittent headaches. With respect to her daily activities, Plaintiff reported that she showered without assistance three times a day and dressed herself. She enjoyed watching television, listening to the radio, and socializing with friends.

Dr. Siddiqui assessed Plaintiff with a normal gait and station and noted that she could walk on her heels and toes without difficulty and used no assistive device. She needed no help changing for the examination or getting on and off the exam table and was able to rise from her chair without difficulty. Plaintiff was dressed appropriately, maintained appropriate eye contact, and appeared oriented to time, person, and place. Dr. Siddiqui assessed that there was no indication of recent or remote memory impairment and no evidence of delusions or hallucinations. Sensory and cranial nerve findings were normal. Plaintiff's mood and affect were appropriate, and her insight and judgment were intact. Her grip strength was five out of five bilaterally and she had five out of five strength in upper and lower extremities with no evidence of tremors or muscle atrophy.

Dr. Siddiqui diagnosed Plaintiff with headaches and depression, noting that she previously had a brain tumor. He found no limitations in Plaintiff's ability to stand or

walk for prolonged periods of time, but a mild to moderate limitation in her ability to perform heavy lifting and bending. He observed that these limitations were "mainly due to [her] recent history of brain tumor resection" and opined that her "[l]ongstanding prognosis [was] fair." (AR 878.)

On December 23, 2013, non-examining state agency medical consultant Richard Cohen, M.D., reviewed Plaintiff's records and opined that Plaintiff regained and retained a normal neurological state after her brain surgery. He noted that Plaintiff took hydrocortisone and Motrin to treat her headaches. He opined that Dr. Siddiqui's medical source statement "for restricted lifting and bending [was] not supported by the normal exam" and found that "neurol[]ogically, [Plaintiff's] impairment was severe but did not remain so for [twelve] months." (AR 124.)

On January 22, 2014, non-examining state agency psychological consultant Cheryl Butensky, M.D., completed a review of Plaintiff's records and found that Plaintiff could remember simple, three-step instructions and procedures. She could also maintain concentration, persistence, and pace on simple, short, and repetitive three-step tasks; handle superficial work-related interaction with co-workers and supervisors; adapt to occasional changes in her work routine; and withstand the stress of a simple work routine. Dr. Butensky opined that Plaintiff might have difficulties interacting with the general public. She found that the opinions of Dr. Fabiano were not consistent with the record and therefore did not rely upon them.

### C.    Plaintiff's Function Reports.

On or about April 20, 2013, Plaintiff completed a Function Report in which she indicated that she was unable to do laundry, shop, vacuum, or dust. She noted that she had a driver's license and could drive for five to ten minutes and shop for food. She reported that her family took care of the dogs and performed general housework for her. She reported no issues with personal care, including dressing, bathing, hair care, shaving, feeding herself, and using the toilet. Due to memory issues, Plaintiff indicated that she could not manage a savings account or pay bills. She stated that her hobbies and

activities included watching TV, going for walks, visiting with family and friends, and attending church every Sunday.

With respect to her physical limitations, Plaintiff reported being able to walk about eight minutes before having to stop and rest for a few minutes. She noted that she could not lift heavy things, could climb only a few stairs, and was able to reach although not overhead. She also indicated that she had difficulty concentrating, occasional difficulty following spoken and written instructions, and short-term and long-term memory loss.

In a November 4, 2013 Function Report, Plaintiff reported that she read, walked, watched television, and listened to music. She did not care for pets and she needed help dressing and bathing due to dizziness. She stated that she required reminders for personal needs and medication and that her family and friends prepared most of her meals. Her husband and family did the household chores, although she tried to help. She sometimes left her house alone but was afraid of getting lost and forgetting how to get home. She had a driver's license and sometimes drove down the street to the corner store. Due to memory issues, Plaintiff reported that she could not pay bills, count change, or handle a savings account.

In describing her daily activities, Plaintiff wrote: "[t]hings in my life have changed, I forget things every day. I have trouble focusing, with my mind – and I have a lot of depress[]ion, and I have a lot of feeling of off balance and confus[]ion[.]" (AR 281.) She reported that lifting, walking fast, climbing stairs, reaching for long periods of time, and squatting were difficult due to dizziness. She noted that she often repeated herself or forgot what she said, which would make her upset. She had trouble following spoken and written instructions and paying attention. She stated that she became "moody and upset quickly[,]" but denied problems getting along with authority figures. (AR 282.) She noted that stress or changes in schedule caused her to be more forgetful, anxious, depressed, and moody.

### D. Testimony at the December 9, 2015 Hearing Before ALJ Jones.

At the December 9, 2015 hearing before ALJ Jones, Plaintiff testified that she graduated from high school with a diploma and may have received some special

education services in elementary school. She noted that she completed one year of medical classes in college without academic assistance, but never received a degree. She stated that she had not worked since February 2013 due to headaches and memory problems, but she struggled to recall precisely the periods when she had been employed.[8] She stated that she was not able to read and write clearly, stating "[w]hen I read something it's been getting confused. I have trouble sounding out certain words. When I do try, I have trouble . . . remembering what I read, and I have trouble spelling." (AR 52-53.)

Plaintiff testified that she lived with her husband and two sons, aged seventeen and twenty-four. She stated that her husband managed her medications, reminded her of appointments, and took time off work to take her to appointments. When asked if she drove, she stated "[n]ot really[,]" and then followed up to clarify that she only drove approximately once per week to places that were not far away because she panicked and did not trust herself to remember the rules of the road.

Plaintiff stated that since her surgery, her feet were swollen, her hand, joints, and body hurt, and she experienced headaches behind her eyes. She stated that nausea caused her to vomit every morning. She had headaches every other day, but noted that lying down, putting a warm cloth over her eyes, and taking ibuprofen helped alleviate her head pain. Plaintiff reported difficulty concentrating, following conversations, remembering people's names, and paying attention. She noted that her memory problems had worsened since 2014. Plaintiff testified that she did not sleep well and typically took naps in the afternoon. She stated that she liked to read but did not understand what she was reading.

With regard to her daily activities, Plaintiff stated that she watched television, let her dog outside and cleaned up after him, folded laundry, dusted on occasion, loaded dishes in the dishwasher, and put away groceries. She testified that since her surgery, she did not usually access her computer during the day, but she had a social media account

---

[8] As the Commissioner points out, Plaintiff had no reported earnings in 2010, 2012, or 2013. She had $102.50 in reported earnings in 2011.

that she accessed approximately once per week. Her husband and sons did most of the grocery shopping and chores. She noted that it was difficult for her to shop because she felt panicky and could not think straight when she was around other people. With regard to social activities, she testified that she sometimes visited with friends at her home and theirs, attended her son's football games, and attended church. She noted that she and her husband enjoyed vacationing, including in Jamaica for a week in 2015.

Plaintiff testified that there had been no regrowth in her tumor. When asked if she had been back to the hospital after her surgery, she testified "[s]omething happened, and he—my husband will be able to tell you . . . I was falling all over the place, I guess." (AR 82.) Plaintiff testified that she broke her clavicle when she accompanied her husband and son while they played Frisbee golf, became dizzy, and fell onto a tree stump. With regard to her physical limitations, Plaintiff testified that she could not lift anything very heavy and sometimes had problems standing due to a lack of balance, sore feet, and exhaustion, but had no trouble sitting.

Plaintiff's husband, Thomas Erdley, testified that after the surgery, Plaintiff did not want to dress, shower, or clean the house as often as she had before the surgery. However, she folded clothes, cleaned counter tops, and took the dogs outside. She was able to drive herself to her mother's house, to her appointments, and felt comfortable driving three to four miles, but did not drive farther than that because she had difficulty remembering driving regulations. He reported that he managed her medications and cooked and that she became frustrated and angry daily. He noted that it was difficult for her to understand concepts and motivate herself to do things, and she often felt depressed, doubtful, and irritated. He testified that her "sleeping habits are crazy[.]" (AR 96.)

Mr. Erdley further testified that he and Plaintiff traveled to Aruba for seven days in 2013 and to Jamaica in 2014. During the trip to Aruba, Plaintiff's feet swelled and Mr. Erdley stated that he considered taking her to a hospital, but ultimately was able to see a doctor at the resort where they were staying. He noted that she slept a lot during both trips.

When asked about Plaintiff's broken clavicle, Mr. Erdley testified that she injured herself while walking through the woods after watching her family play Frisbee golf. After standing, walking, and sitting outside for an hour, she slipped on leaves and landed on a tree stump.

Following Mr. Erdley's testimony, VE Baruch testified that Plaintiff's prior work most closely matched the roles of account clerk, sewing machine operator, and customer service clerk, as defined in the Department of Labor's Dictionary of Occupational Titles. The ALJ questioned VE Baruch about a hypothetical individual with Plaintiff's age, education, and vocational background. This individual would be limited to less than a full range of light duty, meaning she could lift twenty pounds occasionally and ten pounds frequently; carry, push, and pull as much as she could lift; and sit, stand, and walk six hours in an eight-hour day. This individual would be limited to occasional bilateral reaching in any direction, occasional climbing of ladders and scaffolds, and occasional balancing or stooping. This individual would also be limited to hearing and understanding simple oral instructions; performing simple, routine, and repetitive tasks not at a production-rate pace; making simple work-related decisions; and dealing with changes in the work setting limited to work-related decisions. This individual could interact with supervisors and coworkers occasionally, but never with the public. Finally, this individual could only occasionally work at unprotected heights, around moving parts, or operating a motor vehicle, and would be limited to moderate noise levels.

VE Baruch opined that, given those limitations, the hypothetical individual would not be capable of performing any of Plaintiff's past work. The ALJ then asked VE Baruch whether there were any occupations in the national economy that this individual could perform. VE Baruch responded: "[i]n my opinion, I would rule out all work with this hypothetical[.]" (AR 106.) The ALJ then asked whether there would still be no work if she modified the hypothetical to a sedentary work level. VE Baruch responded "[n]ot with occasional bilateral reaching, because the majority of jobs would be production-paced jobs, and they all require frequent reaching. The only job that an individual could do within that hypothetical would be something like a Surveillance

System Monitor." (AR 107.) VE Baruch testified that there were approximately 8,830 Surveillance System Monitor jobs nationally. Plaintiff's attorney asked VE Baruch to estimate how much off-task time and how many absences an employer would typically tolerate. VE Baruch testified that an employer would typically tolerate ten percent off-task time and one missed day of work per month.

### III. ALJ Jones's January 14, 2016 Decision.

In order to receive disability benefits under the SSA, a claimant must be disabled on or before the claimant's date last insured ("DLI"). A five-step, sequential evaluation framework determines whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

On January 14, 2016, ALJ Jones denied Plaintiff's application for DIB, finding that she was not disabled. In so ruling, she determined that Plaintiff had not engaged in substantial gainful activity from her alleged onset date of February 5, 2013 through her DLI of September 30, 2014. At Step Two, she found that Plaintiff suffered from the following severe impairments: "a benign brain tumor status post-surgical removal, and

depression[.]" (AR 19.) At Step Three, ALJ Jones concluded that none of Plaintiff's impairments, either independently or collectively, met or exceeded the severity of one of the listed impairments. In making this determination, she considered Listings 11.05, 11.18, 12.02, and 12.04.

At Step Four, she determined that Plaintiff had the residual functional capacity ("RFC") to:

> [P]erform sedentary work as defined in 20 CFR [§] 404.1567(a) except occasional bilateral reaching in any direction; occasionally climbing ladders and scaffolds, balancing, or stooping[.] This individual also is limited to hearing and understanding simple oral instructions; performing simple, routine and repetitive tasks but not at a production rate pace; making simple work-related decisions; dealing with changes in the work[-]related setting limited to simple work-related decisions; and can only occasionally interact with supervisors, coworkers, and never with the public. Finally, this individual can only occasionally work at unprotected heights, around moving parts, operating a motor vehicle, and was limited to moderate noise levels.

(AR 22-23.) At Step Five, she concluded that Plaintiff was unable to perform any past relevant work, but could perform a significant number of jobs in the national economy such as "surveillance systems monitor[.]" (AR 29.) For this reason, ALJ Jones found that Plaintiff was not disabled from February 5, 2013 through September 30, 2014, her DLI.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402

U.S. 389, 401 (1971)). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149. "It is the function of the Secretary, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal quotation marks omitted) (alteration in original).

To be entitled to DIB, Plaintiff must establish that she became disabled prior to the expiration of her insured status. 42 U.S.C. §§ 416(i), 423(c). Plaintiff was insured for DIB only through September 30, 2014. Evidence of an impairment which reached disabling severity after the expiration of an individual's insured status cannot be the basis for a determination of entitlement to DIB. *See Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989) (holding that plaintiff "can only be entitled to a 'period of disability,' if his continuous disability began before [his date last insured]"). In order to establish disability, the evidence must show that the claimant is unable to work due to a physical or mental impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques" that "has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A), (d)(3).

### B. Whether the ALJ Properly Evaluated Plaintiff's Credibility.

Plaintiff contends that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner counters that the ALJ properly evaluated Plaintiff's credibility and that this court has limited authority to disturb a credibility determination on appeal.

When supported by specific reasons, "an ALJ's credibility determination is generally entitled to deference on appeal." *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013). It is the function of the Commissioner, not the court, to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

The Social Security Regulations outline the following factors to be considered in evaluating credibility: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii). The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7P, 1996 WL 374186, at *2 (July 2, 1996).

In the instant case, ALJ Jones found that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible[.]" (AR 25.) The ALJ found that the record did not support Plaintiff's allegations regarding her symptoms, noting that she made inconsistent statements about when she stopped working; she "testified that she could not use a computer, but then clarified to say she did use it, but 'not too often[,]'" (AR 23); she said that she did not drive but then said that she did not drive very far; and she attributed her fall to the presence of leaves but "explained she was able to stand, walk, and sit on the frisbee golf course until she fell." *Id.* Several of these observations are either an inaccurate portrayal of the record or focus on trivial discrepancies. For example, Plaintiff did not testify that she "could not use a computer," *id.*; rather, she stated that did not "usually get on the computer during the day[,]" but that she had a social media account that she accessed approximately once a week. (AR 66.) Similarly, the manner in which various accounts describe Plaintiff landing on a tree stump is not particularly relevant to her credibility. However, ALJ Jones also provided several more cogent reasons for finding Plaintiff's testimony not entirely credible. For example, she

noted that Plaintiff provided inconsistent evidence regarding why she had stopped working and in fact had not engaged in substantial gainful wage earning activity for the three years preceding her brain surgery. The ALJ further pointed out that Plaintiff claimed "a learning disability" but "the current record does not provide any support for this impairment or the presence of any related symptoms that interfered with the claimant's ability to perform basic work activities." (AR 20-21.) ALJ Jones noted that on March 15, 2013, Plaintiff reported that her headaches resolved with over-the-counter, non-steroidal, anti-inflammatory medication and that while Plaintiff's providers recommended that she pursue neurological therapy and neuropsychological testing, the record contains "no evidence of her follow-up with this." (AR 25.) Although Plaintiff underwent both a psychiatric and a neurologic evaluation in conjunction with her application for disability benefits in November 2013 and began attending monthly psychotherapy sessions with Dr. Ruben in October 2014, it appears that she delayed seeking psychotherapy treatment until the DLI.

ALJ Jones also noted that: "[p]ost-DLI psychotherapy treatment notes reflect the claimant's report that the surgery damaged her brain (See Generally Exhibit 27F, 28F); however, the record does not substantiate these statements either before or after the DLI."[9] (AR 23.) The ALJ is correct in observing that Dr. Landi's treatment notes do not include any mention of "brain damage." Indeed, Plaintiff, herself, concedes that "Dr. Landi felt that her memory issues, dizziness, and headaches were psychological" and "Dr. Landi and Dr. Ruben felt the primary cause of her cognitive symptoms and headaches was psychiatric in nature[.]" (Doc. 14 at 6.) She claims, however, that she nonetheless received treatment for "several medical conditions which explain her disabling symptoms." *Id.*

---

[9] The ALJ cited to Dr. Ruben's treatment notes, which include the following statements: "[Plaintiff] presents as anxious and is still very frustrated about the memory loss she experiences as a result of the tumor removal[,]" (AR 1033); "[Plaintiff] reports that she finally had the frank discussion with her neurosurgeon Dr. Landi about her memory [and] [h]e stated that the surgery likely did cause brain damage though [it] saved her life[,]" (AR 1035); and "Dr. Landi has confirmed that there was [brain] damage." (AR 1037).

Finally, ALJ Jones cited Plaintiff's "repeated denial of any depression or anxiety symptoms and her treatment providers' consistent observation of normal mood, affect, and memory during the period at issue" as evidence of her lack of credibility. (AR 25.) The record reflects that although Plaintiff at times reported depression, anxiety, and memory loss, on other occasions she did not.[10]  Although Plaintiff is correct that not all psychological conditions are detected in an examination, the ALJ was entitled to consider the objective testing and clinical findings of her treating physicians in determining whether her symptoms were caused by a medical impairment.  Because the ALJ's credibility determination of Plaintiff was supported by substantial evidence, the court cannot disturb it on appeal even if it might reach a different conclusion.  *See Aponte*, 728 F.2d at 591 (holding that it is the function of the ALJ to "resolve evidentiary conflicts and to appraise the credibility of witnesses").

**C.    Whether the ALJ Properly Evaluated Mr. Erdley's Testimony.**

Plaintiff argues that the ALJ erred in evaluating the testimony of her husband and finding it inconsistent with the record.  In addition to evidence from acceptable medical sources, an ALJ may consider "evidence provided by other 'non-medical sources' such as spouses, other relatives, friends, employers, and neighbors."  SSR 06-03P, 2006 WL 2329939, at *3 (Aug. 9, 2006).  In evaluating evidence from these sources, an ALJ is instructed to consider "such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence."  *Id.* at *6.  An ALJ "generally should explain the weight given to

---

[10] *Compare* AR 387 (Plaintiff told Dr. Landi on March 21, 2013 that she had difficulty finding words and lost her train of thought easily); AR 960 (Dr. Landi noted in July 2013 that Plaintiff continued to experience short-term and long-term memory difficulties); AR 887 (Plaintiff reported to Dr. Matteson in October 2013 that she was very upset about her memory loss and felt depressed); AR 972 (Plaintiff told Dr. Landi in November 2013 that she was suffering from depression, anxiety, and memory impairment); AR 873 (Dr. Fabiano concluded that Plaintiff's recent and remote memory skills were impaired), *with* AR 368 (Dr. Wnek indicated that Plaintiff had normal mood and affect and intact memory on March 14, 2013); AR 769 (Dr. Wnek noted that Plaintiff's mood was normal and memory was intact on May 23, 2013); AR 985 (Dr. Murphy found that Plaintiff had a normal mood, intact memory, and normal attention and concentration).

opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning[.]" *Id.* "The testimony of lay witnesses may be entitled to great weight if uncontradicted in the record." *Kuleszo v. Barnhart*, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002).

ALJ Jones stated that "significant weigh cannot be given to [Mr. Erdley's] testimony" and provided the following reasons for her determination: (1) he was not medically trained to "make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms[;]" (2) he was not a disinterested witness due to his relationship with the Plaintiff; and (3) his testimony was not consistent with medical evidence in the record. (AR 28.) Evidence offered by non-medical sources such as spouses and other relatives is, by definition, non-medical evidence offered by someone who has a relationship with the Plaintiff. The first two rationales provided by ALJ Jones are therefore insufficient to explain her decision to discount Mr. Erdley's testimony. *See Cousino v. Comm'r of Soc. Sec.*, 2013 WL 4809267, at *8 (D. Vt. Sept. 10, 2013) (holding that the ALJ erred in discounting statements by plaintiff's family members on the grounds that they lacked medical expertise and were not disinterested third parties); *Taylor v. Berryhill*, 2017 WL 5900955, at *12 (D. Conn. Nov. 30, 2017) (holding that the fact that a family member cares about the plaintiff "does not constitute substantial evidence upon which to reject his testimony").

An ALJ, however, may consider consistency with the record in evaluating a family member's credibility. The ALJ noted that Mr. Erdley testified that after Plaintiff's surgery, he performed most of the household chores; Plaintiff became frustrated and angry on a daily basis; Plaintiff did not drive frequently; she had difficulty following conversations; and it took a long time for Plaintiff to become motivated to complete tasks. The ALJ properly found that these statements were "not consistent with the preponderance of the opinions and observations by medical doctors in this case during the period at issue." (AR 28.)

Mr. Erdley further testified that Plaintiff's mood fluctuated and her memory and motivation decreased after her surgery and remained impaired through the date of the hearing. Although immediately post-surgery Plaintiff was temporarily fully disabled, her treating physicians attributed her symptoms to a personality and anxiety disorder and not to symptoms resulting from her surgery.

Because Mr. Erdley's statements are not consistent with the conclusions of Plaintiff's treating providers, the court does not disturb the ALJ's decision to assign his opinions less than significant weight.[11] *See Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (affirming the ALJ's credibility findings where they were "closely and affirmatively linked to substantial evidence").

### D. Whether the ALJ Failed to Properly Develop the Record.

Plaintiff asserts that the following statement by the ALJ acknowledges a gap in the record:

> The evidence showed that the claimant's symptoms intensified as time wore on. However, for the determination of benefit entitlement, the undersigned is constrained to consider only the evidence during the period at issue to determine the claimant's disability at that time. No objective medical evidence or medical opinions establish a clear link between the claimant's current symptoms [and] medical evidence from the period at issue.

(AR 25.) Plaintiff argues that ALJ Jones's failure to seek additional evidence to resolve this gap in the evidence is reversible error and suggests that the ALJ could have addressed the gap by re-contacting Dr. Ruben. The Commissioner describes the record as fully developed and points out that the ALJ allowed Plaintiff additional time after the hearing to submit a Mental Impairment Questionnaire completed by Dr. Ruben, which the ALJ considered in making her determination.

---

[11] The court notes that despite indicating that she did not give significant weight to Mr. Erdley's testimony, ALJ Jones nonetheless relied on Mr. Erdley's testimony in finding that Plaintiff was limited to "occasional interaction with co-workers and supervisors, and never with the general public." (AR 26.)

"It is the rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks, omissions, and alterations omitted); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (observing that an ALJ has an obligation to develop the record because "of the non-adversarial nature of . . . benefits proceedings"). "This duty exists even when the claimant is represented by counsel[,]" *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996), and extends to addressing "gaps in the administrative record[.]" *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)); *see also Burgess*, 537 F.3d at 129 ("In light of the ALJ's affirmative duty to develop the administrative record, an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.") (internal quotation marks omitted).

In the case at bar, there is no clear gap in the administrative record because Plaintiff's current symptoms and her symptoms during the relevant period are fully reflected in the medical record. Dr. Ruben re-evaluated Plaintiff on December 8, 2015 and ALJ Jones considered Dr. Ruben's opinions. ALJ Jones therefore did not err in failing to adequately develop the administrative record. *See Whipple v. Astrue*, 479 F. App'x 367, 370 (2d Cir. 2012) (noting that a Commissioner will recontact a treating physician only if that physician's information is inadequate to determine whether the claimant is disabled).

### E. Whether Plaintiff's Impairments Met the Requirements of Listing 12.04.

Plaintiff contends that she experienced "functional limitations which would result in an award of disability benefits at step three under Medical Listing 12.04[.]" (Doc. 14 at 11.) Plaintiff points out that in December 2015, Dr. Ruben checked a box indicating that Plaintiff had a "[m]edically documented history of a chronic organic mental, schizophrenic, etc. or affective disorder of at least [two] years[] duration that has caused more than a minimal limitation of ability to do any basic work activity[.]" (AR 1077.)

Plaintiff argues that even though Dr. Ruben's opinion was rendered after Plaintiff's DLI of September 30, 2014, "Dr. Ruben has effectively indicated that [Plaintiff] has suffered from anxiety and depression with its attendant cognitive deficits such as memory loss since at least December 2013" and this medical evidence establishes that Plaintiff's impairments satisfy Listing 12.04. (Doc. 14 at 10.)

An ALJ must "set forth a sufficient rationale in support of his decision to find or not to find a listed impairment." *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982); *see also Hamedallah ex rel. E.B. v. Astrue*, 876 F. Supp. 2d 133, 142 (N.D.N.Y. 2012) ("Where the claimant's symptoms, as described by the medical evidence, appear to match those described in the Listings, the ALJ must provide an explanation as to why the claimant failed to meet or equal the Listings. . . . Setting forth a single sentence is insufficient.").

In order to satisfy the criteria for Listing 12.04 for depressive, bipolar, and related disorders, a plaintiff's impairments "must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C." 20 C.F.R. § pt. 404, subpt. P, App. 1 § 12.00(A)(2).[12] ALJ Jones considered whether Plaintiff's impairments met or medically equaled the criteria of Listing 12.04 and provided an explanation for why Plaintiff's conditions did not. She concluded that "[b]ecause the claimant's mental impairments did not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria were not satisfied." (AR 22.) She further concluded that the paragraph C criteria were not satisfied because "the medical evidence does not establish a history of a mental impairment of at least [two] years[] duration that has caused more than a minimal

---

[12] "Paragraph A of each listing . . . includes the medical criteria that must be present in your medical evidence." *Id.* § 12.00(A)(2)(a). Paragraph B criteria "represent the areas of mental functioning a person uses in a work setting. They are: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.* § 12.00(A)(2)(b). "To satisfy the paragraph C criteria, your mental disorder must be "serious and persistent"; that is, there must be a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence that satisfies the criteria in both C1 and C2[.]" *Id.* § 12.00(A)(2)(c).

limitation of ability to do basic work activities[.]" *Id.* She explained that "[a]s for episodes of decompensation, the claimant never experienced any episodes of decompensation of extended duration. The evidence does not disclose any inpatient psychiatric hospitalizations for two weeks or longer." *Id.* The ALJ noted that Dr. Ruben's December 2015 opinion was rendered over a year after Plaintiff's DLI and therefore did not provide a basis for concluding that Plaintiff satisfied a listing during the relevant period. She also concluded that Dr. Ruben's opinion was entitled to "little weight" because it was not supported by Dr. Ruben's treatment notes which indicated that Plaintiff improved with treatment.

Because ALJ Jones's determination that Plaintiff's impairments did not satisfy Listing 12.04 is "supported by substantial evidence[,]" *Berry*, 675 F.2d at 468, a remand is not required.

> ### F. Whether the ALJ's Step Five Finding is Supported by Substantial Evidence.

Plaintiff describes her "main point" on appeal as a contention "that the Surveillance-System Monitor job (DOT No. 379.367-101) as an unskilled, sedentary job no longer exists in significant numbers in the national economy" and "has a checkered and suspect history in the case law." (Doc. 10-1 at 15.) Plaintiff argues that the ALJ thus erred by relying on VE Baruch's testimony that there were 8,830 Surveillance System Monitor jobs existing in the national economy. Plaintiff observes that in *Beltran v. Astrue*, 700 F.3d 386, 390 (9th Cir. 2012), a VE testified that there were only 1,680 Surveillance System Monitor jobs nationally and the court concluded that this did not constitute a significant number of jobs.

Where, as here, the claimant has been successful at Step Four of the sequential analysis in showing that he or she is unable to perform his or her past relevant work, the Commissioner has the burden at Step Five to prove that "the claimant still retains a [RFC] to perform alternative substantial gainful work which exists in the national economy." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). "[W]hen a claimant's nonexertional impairments significantly diminish his ability to work—over and above

any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the [Commissioner] must introduce the testimony of a [VE] (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Id.* at 603.

The Commissioner's factual findings regarding the number of jobs available to a claimant are "'conclusive' in judicial review of the benefits decision so long as they are supported by 'substantial evidence.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019) (citing 42 U.S.C. § 405(g)). The Supreme Court has declined to adopt a categorical rule requiring VEs to provide the data that they have relied upon to estimate the number of jobs existing in the economy. *See id.* ("The question presented is whether [the VE's] refusal to provide . . . data upon the applicant's request categorically precludes her testimony from counting as 'substantial evidence.' We hold it does not."). The Court nonetheless noted that "[i]n some cases, the refusal to disclose data, considered along with other shortcomings, will prevent a court from finding that 'a reasonable mind' could accept the expert's testimony." *Id.* at 1156 (citation omitted). Whether a VE's testimony is supported by substantial evidence must therefore be determined on a "case-by-case" basis. *Id.* at 1157. The Second Circuit has held that it is sufficient that a VE "identified the sources he generally consulted to determine [job numbers]," noting "the marked absence of any applicable regulation or decision of th[e] Court requiring a vocational expert to identify with greater specificity the source of his figures or to provide supporting documentation." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 450 (2d Cir. 2012) (internal quotation marks and citation omitted).

Here, ALJ Jones asked VE Baruch whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and RFC. VE Baruch stated that no work would be available and at the ALJ's prompting, modified her response, stating, "[t]he only job that an individual could do within that hypothetical would be something like a Surveillance System Monitor." (AR 107.) VE Baruch testified that there were approximately 8,830 such jobs in the national economy, but did not disclose how she made that determination.

The court cannot determine the number of Surveillance System Monitor jobs that exist in the national economy as matter of law both because that number varies and because whether an ALJ's assessment of the number of jobs available in the economy is supported by substantial evidence must be determined on a "case-by-case" basis. *Biestek*, 139 S. Ct. at 1157. Because the Supreme Court has found that VEs do not need to disclose the sources of their data in order to give reliable testimony and because Plaintiff does not provide any other basis for questioning VE Baruch's reliability, the VE's testimony constitutes substantial evidence. *See id.* (finding an ALJ's determination was supported by substantial evidence even where the VE refused to provide the source of his data on the number of jobs available); *Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009) (upholding an ALJ's Step Five determination where "the expert's testimony on this point did not introduce any meaningful uncertainty as to the number of charge account clerk positions available in the local or national economy"); *Galiotti v. Astrue*, 266 F. App'x 66, 68 (2d Cir. 2008) (upholding an ALJ's determination even though the VE was "unable to specify how he arrived at the number of jobs available in the economy for the positions of security surveillance monitor and information clerk").

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiff's motion for judgment on the pleadings (Doc. 10) and GRANTS the Commissioner's motion for judgment on the pleadings (Doc. 12).

SO ORDERED.

Dated at Burlington, Vermont, this 18ᵗʰ day of July, 2019.

Christina Reiss, District Judge
United States District Court